Herman Paster, Petitioner v. Commissioner.
Paster v. Commissioner
Docket No. 38018.
United States Tax Court
T.C. Memo 1956-144; 1956 Tax Ct. Memo LEXIS 147; 15 T.C.M. (CCH) 721; T.C.M. (RIA) 56144; June 20, 1956
*147 Sidney J. Kaplan, Esq., and Claude E. Petersen, Esq., 654 McKnight Building, Minneapolis, Minn., for the petitioner. J. Marvin Kelley, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: Respondent has determined deficiencies in income tax against petitioner for the years 1944, 1945 and 1946 in the respective amounts of $40,768.14, $24,588 and $38,683.15. The question for decision is whether the partnership profits credited on the partnership books as trust income were the income of the petitioner. A question with respect to a $7,000 adjustment of deductions for miscellaneous expenses for 1946 has been conceded by the petitioner. Similarly, a $4,800 adjustment to salary for the year 1946 has been conceded by the respondent. Findings of Fact Some of the facts have been stipulated and are found as stipulated. Petitioner is a resident of St. Paul, Minnesota. He filed his income tax returns for the taxable years here in question with the collector of internal revenue for the district of Minnesota. For some period not shown but prior to 1937, petitioner had been engaged as a salesman of novelty equipment such as pinball machines, *148 juke boxes and miniature bowling alleys. He decided to go into business for himself and early in 1937 rented a small place in St. Paul, bought some machines in Chicago and had them shipped c.o.d. He borrowed the money to pay for the machines from Samuel Taran, his wife's uncle. Within approximately one month his funds were depleted and he was unable to continue the business. He reported the matter to Taran who took over the business and employed petitioner to run it for him. Petitioner was to receive as compensation for such services $35 per week and 15 per cent of profits. The business, sometimes referred to as Mayflower, was first known as Mayflower Novelty Company but after January 31, 1944, used the name Mayflower Distributing Company. Its business was that of buying, selling, distributing and operating coin-operated machines, apparatus and devices. Its books were kept and its returns were filed on the basis of a fiscal year ending January 31. According to its returns, Mayflower was a partnership from the time Taran took over the business until January 31, 1946, when it was purchased by petitioner. As shown by the returns filed, the partners were Taran, his nephew J. H. Nilva, *149 and a trust denominated "S. H. Taran, J. H. Nilva Trust." J. H. Nilva was listed on the returns as being in the Navy for each of the years herein. On the return for the year ended January 31, 1944, his share of the profits was reported as $37,266.52. No profits were reported for him for the years ended January 31, 1945 and 1946. For the fiscal year ended January 31, 1944, $67,079.73 was reported as the distributive share for the trust. For the years ended January 31, 1945 and 1946, when no distributive shares were shown for Nilva, the distributive shares of the partnership profits were shown 50 per cent to Taran and 50 per cent to the trust. For the fiscal year 1945, 50 per cent of the ordinary net income reported was shown as $53,978.66. Net long-term gain was also reported, 50 per cent thereof being shown as $198.50. In the return for the fiscal year 1946 a net operating loss of $34,978.51 was reported. Net short-term gain was shown as $89,372.02, net longterm gain as $67,015.37. The net operating loss and the net short- and long-term capital gains were reported as being 50 per cent distributable to Taran and 50 per cent distributable to the trust. When petitioner acquired the business *150 at January 31, 1946, however, all funds standing to the credit of Nilva individually and to the trust were distributed to Taran. During parts of 1944 and 1945 Taran was incarcerated in a Federal prison at Sandstone, Minnesota. He was an alien and not a citizen of the United States. Under date of December 29, 1942, petitioner executed three instruments entitled respectively "Herman Paster - Trust Agreement for the Benefit of Celia Paster," "Herman Paster - Trust Agreement for the Benefit of Donald Joseph Paster" and "Herman Paster - Trust Agreement for the Benefit of Edward Jacob Paster." In each instrument it was recited that petitioner, called therein "the Donor," has "transferred, assigned, set over and delivered * * * unto himself and Sam Walzer" as trustees "A Ten Thousand ($10,000.00) Dollar interest in the proceeds due Herman Paster as earnings for services rendered to the Mayflower Novelty Company." Celia Paster is petitioner's wife and Donald Joseph and Edward Jacob are his sons. Except as to the named beneficiaries and the dates for termination of the trusts, the instruments were identical and among other things each instrument recited that the trustees should have full *151 power to sell, buy and manage any property comprising the trust property, "to collect, recover, and receive the income thereof and therefrom," and should not be responsible for any loss or damage which might result from the exercise of judgment or discretion "nor for any moneys or property except such as shall actually and in fact come into their possession" under the instrument; that no part of the income should be used to pay any life insurance premiums on policies on the life of petitioner; that at least 15 per cent of the income should be distributed annually to the beneficiary and the remainder distributed or retained as corpus in the discretion of the trustees; that the trusts should terminate on November 18, 1960, in the cases of Celia and Donald Joseph, that date being Donald Joseph's twenty-first birthday, and in the case of Edward Jacob on August 22, 1962, which would be his twenty-first birthday; that in the event of death of the beneficiary distributions were to go to issue and there being no issue to heirs at law; that the trustees should "keep and maintain separate books and records covering the trust estate"; that the trust was irrevocable and should not be capable of *152 modification except as in the instrument specifically authorized and directed; that additions to the trust res might be made by petitioner or others by the execution to that effect by the contributor of an instrument in writing and written acceptance thereof by the trustees; and finally that each trustee should receive $100 per year as compensation for his services. Each instrument also contained provisions which for the purposes here may be referred to as spendthrift provisions. Sam Walzer is petitioner's brother-in-law, being married to petitioner's sister. On some date not shown, possibly late in 1939, petitioner's compensation for his services to Mayflower had been increased to $75 per week and 20 per cent of the net profits, and at the close of the fiscal year ended January 31, 1943, Mayflower, according to its books, was indebted to him for services rendered in the amount of $51,511.82. In petitioner's drawing account, however, there was a debit balance of $17,443.32, indicating $34,068.50 as the net balance in petitioner's favor per the Mayflower books. Under date of February 1, 1943, the above $51,511.82 was entered in an account entitled "Note Payable - H. Paster," under *153 the description "Balance transferred from prev book." Of the said $51,511.82, there was no withdrawal from Mayflower of the $30,000 purportedly assigned by petitioner to himself and Walzer as trustees under the above instruments. But also under date of February 1, 1943, a debit of $30,000 was entered in the "Note Payable - H. Paster" account, under the description "trans to Note payable - H Paster, S. Walzer trust," and under the same date an account entitled "Note Payable - H. Paster, Sam Walzer Trust" was credited in the amount of $30,000, as "Amt set up as trust investment." At the close of the fiscal year ended January 31, 1944, and as "Profits accruing to Trusts fiscal yr end 1/31/44," $51,519.81 was entered as a credit to the above "Note Payable - H. Paster, Sam Walzer Trust" account. The amount so entered had been taken from a memorandum or tabulation prepared by Walter Johnson, Mayflower's accountant and bookkeeper. On this tabulation, which was entitled "Mayflower Distributing Co - Determination of moneys due others - year 2/1/43 - 1/31/44," and after Mayflower's "Combined income," together with some limited breakdown thereof, was shown as $245,332.42, the following appeared: *154 In consideration of $10,000.00 invested in business for each of 3 trusts the partnership has agreed to pay 7% of profits to each of trusts in return the original investment to remain in business & not subject to being withdrawn without consent of partnership 7% due Celia Paster
Trust
$17,173.27
7% due Donald Paster
Trust
17,173.27
7% due Eddie Paster
Trust
17,173.27
21% totals
$51,519.81
14% due H. Paster for
services rendered
34,346.54
Total Amt. due others
$85,866.35
The above tabulation "Determination of moneys due others" was prepared by Johnson on instructions from Taran and it was shown to Taran before entries were made therefrom in Mayflower's books. As of February 1, 1943, and pursuant to instructions, presumably from Taran, Johnson had set up on Mayflower's books an account entitled "Note Payable ** M. Roisner' and entered therein a credit of $40,000. Under date June 30, 1943, the account had been closed by an offsetting debit of $40,000. [1]
Tabulations similar to that indicating "moneys due others" for the fiscal year 1944 were prepared at the close of the fiscal years ended January 31, 1945, and January 31, 1946, from which credit *155 entries to the "Note Payable - H. Paster, Sam Walzer Trust" account were made, the credit under date of January 31, 1945, being shown as "Profits for year end 1/31/45," $33,879.66, and that under date of January 31, 1946, as "Profits for fiscal yr end 1/31/46," $31,680.28. Actually, as shown or reflected by the tabulation, 21 per cent of Mayflower's profits for its fiscal year 1945 was $36,879.66, and not $33,879.66 as credited, the $12,293.22 shown as "7% due Celia Paster, trust" and identical amounts shown as "7% due Donald Paster, trust" and "7% due Eddie Paster, trust" each being reduced by $1,000 described in each instance as "Less hold back to following year." And as reflected by the tabulation for the fiscal year 1946, the amount shown or reflected as 21 per cent of Mayflower's profits for that year was $36,223.26, and not $31,680.28 as actually credited. In truth, however, the amount shown as "Totals" of the three 7 per cent items was neither the $31,680.28 actually credited nor $36,223.26, the correct total for the year, but $39,223.26, the $12,074.42 shown as "7% due Celia Paster, trust" and identical amounts shown as "7% due Donald Paster, trust" and "7% due Eddie Paster, *156 trust" each being increased by $1,000 described in each instance as "Add. Bal due from prev year" or "due from prev yr." In entering the credit in "Note Payable - H. Paster, Sam Walzer Trust" account, however, the aggregate of $39,223.26 so arrived at was reduced by $7,542.98 described as "Cr given H. Paster on Paster Dist Co books for payts to Celia Paster" to arrive at the $31,680.28 actually credited. *157 As to petitioner, in the above tabulation for the fiscal year 1945, $24,586.44 was shown as "14% due H. Paster for services rendered," which amount was reduced by $2,000 described as "Less hold back to next year" to arrive at $22,586.44 shown as "Net due to H Paster." $56,466.10 was shown as "Total due to others," and was the total of the $22,586.44 shown as "Net due to H Paster" and the $33,879.66 actually carried into the account "Note Payable - H. Paster, Sam Walzer Trust." In the tabulation for the fiscal year 1946, $24,149.84 was shown as "14% due H. Paster for services rendered," which amount was increased by $2,000 described as "due from prev year" to arrive at $26,149.84. $65,373.10 was shown as "Total pd to others," and was the total of the said $26,149.84 and the above $39,223.26 from which the $31,680.28 actually credited to the trust account was derived. In the regular course of keeping Mayflower's accounts and in the reporting of its income, the amounts credited to the "Note Payable - H. Paster, Sam Walzer Trust" account and as derived from the above side tabulations were not treated either as in payment for the use of money or as distributions of a percentage of profits *158 based on investment, but as selling expenses. For each of the fiscal years 1945 and 1946, the amounts in question were first entered in the journal in a lump sum described as "H Paster Bonus" and carried from there likewise in a lump sum to a ledger account denominated "Salary & Bonus - H Paster H Paster, trusts," and then, after being lumped with the amounts shown as covering petitioner's weekly salary, [2] cleared to profit and loss. For the fiscal year 1944, there were two journal entries of "Bonus," one as "H. Paster, Bonus" and the other as "H. Paster, Trust, Bonus," the amounts being the same as those shown on the side tabulation "Determination of moneys due others." When carried to the "Salary & Bonus" account in the ledger, however, they were entered in a lump sum, as was done for the fiscal years 1945 and 1946. [3] In the partnership returns, the amounts shown in the "Salary & Bonus - H Paster H Paster, trusts" account, although broken down and shown as salary of petitioner, bonus of petitioner and bonus of H. Paster or Herman Paster "Trusts" or "Trust Funds," were all deducted as selling expenses. *159 By entry as of January 31, 1944, a debit of $17,188.56, described as "Cr due H Paster for disbursement to C Paster & bonds for Donald Eddie," was entered in the "Note Payable - H. Paster, Sam Walzer Trust" account on Mayflower's books. Penciled notations in proximity to the descriptive matter appear to indicate that $2,118.56 related to "C Paster" and $15,000 to "Donald Eddie." Under date of March 31, 1945, a debit of $16,438.02 was entered in the said account, with a breakdown in the descriptive statement indicating that it represented payments in various amounts of state and Federal taxes relating to "Edward & Donald" and "Celia." Thereafter, under dates ranging from April 30, 1945, to January 1, 1946, five debit entries amounting in the aggregate to $2,717.76 were made in the said account, four of which, according to descriptive wording, related to 1944 and 1945 state tax and income tax "Celia Paster," whereas the fifth entry, in the amount of $68.52, was described as "Ins premium N W Natl Life Donald P Paster." Under date of January 31, 1946, the said account on Mayflower's books was closed by a debit entry of $110,735.41, under the description "Trans to H Paster draw in exchange *160 for note." No books were ever set up or maintained for the three trusts purportedly created by petitioner under the instruments above. Johnson did maintain in pencil and on ruled yellow worksheet paper what he has denominated as a running account for each purported trust. There was one sheet for each such trust and the sheets were kept by Johnson in his desk. According to these sheets, and aside from original credits of $10,000 each, the aggregate of credits up to and including January 31, 1946, was $124,622.73, or $41,540.91 to each sheet. On the "Herman Paster - Sam Walzer trustees for Celia Paster" sheet and in a column headed "deductions" is an undated entry, but presumably made prior to January 31, 1944, of $2,188.56 described as "Payt on note - stock pool advance." There were no entries under "deductions" for the fiscal year 1945. A further entry described as "Payt on note stock pool advance," in the amount of $7,542.98, was made under date of January 31, 1946. Under dates ranging from March 14, 1945, to "Dec 45," seven other entries were made in the "deductions" column, amounting in the aggregate to $8,605.32, which entries purport to cover payments of taxes. On the sheets *161 denominated "Herman Paster - Sam Walzer trustees for Donald Paster" and "Herman Paster - Sam Walzer trustees for Edward Paster" and in columns headed "deductions," $7,500 was shown for the fiscal year 1944 on each sheet, that on the Donald Paster sheet being described as "Withdrawn by H.P. for bonds" and that on the Edward Paster sheet being described as "Withdrawals by H.P. for bonds & Real Estate." No amounts were entered as "deductions" for the fiscal year 1945. For the fiscal year 1946, four entries, in the aggregate amount of $5,245.97, are shown on each sheet and described as 1944 Federal and state fiduciary and individual tax. On the Donald Paster sheet an additional amount of $68.52, described as "N.W. Natl Life - ins prem.," was entered under date of "Oct. 45." In addition to the above and separated by a red line from the columns from which the entries above were recited, each sheet carries a column headed "other trust deductions." On the Celia Paster sheet, under dates ranging from April 1944 to July 31, 1944, there were seven entries, amounting in the aggregate to $8,605.32, and for the fiscal year 1946, three items amounting to $1,109.17. The largest single item was $5,382.16, *162 described as "Payt on note - Stock pool advance." According to descriptive wording, the other nine items purported to cover such matters as tax, hospital insurance, "Mrs H Paster," "Mrs Paster Rwy ticket," and deposits "C Paster ch ing a/c." On the Donald Paster sheet, the "other trust deductions" entries were $116.44 for the fiscal year 1944, $330.25 for the fiscal year 1945 and $264.32 for the fiscal year 1946, consisting in all of seven entries, all of which purportedly were for insurance premiums paid to "N.W. Natl Life." On the Edward Paster sheet, in the column "other trust deductions," two entries for the fiscal year 1945, in the aggregate amount of $257.72, and two entries, amounting in the aggregate to the same amount, for the fiscal year 1946 were shown, and according to the descriptive wording, were for insurance premiums paid to "N.W. Natl Life." According to explanatory symbols, the items entered, as noted above, in the column headed "other trust deductions" represented amounts paid by Mayflower Distributing Company, Paster Distributing Company and H. Paster personally. Although they appear as indicated on the so-called trust accounts and were possibly provided by or *163 at the instigation of petitioner, they were not taken into account in arriving at the $110,735.41, the entry closing out the "Note Payable - H. Paster, Sam Walzer Trust" account on Mayflower's books, as having been transferred to petitioner "in exchange for note." The entries on the three yellow sheets purport to extend through October 31, 1947. The only amounts shown as credits on the Celia Paster sheet after January 31, 1946, were in three entries, two in February and one in July of 1946, and four entries one each in February, March, July and August of 1947, the 1946 entries amounting in the aggregate to $262.50 and those for 1947 to $275. These items were all described as interest on bonds or interest on government bonds. The only other items shown on the Celia Paster sheet dated after January 31, 1946, were in the "other trust deductions" column, and consisted of four items in 1946, amounting in the aggregate to $8,238.95, and seven in 1947, amounting to $2,985.87. The largest single item, as was true of earlier years, was described as "Cr for cash advanced on Stock Pool," and was $7,542.98. The other items, with one exception, were described as payment of Federal and state taxes. *164 The one exception was dated "June 1947" and described as "R E tax 1752 Pinehurst 1st half." On the Donald Paster sheet, only one amount, $762.91, described as "Refund on '46 tax," was shown as an addition to the purported trust fund after January 31, 1946. Seven items amounting in the aggregate to $2,892.91, from April to October, 1946, and six items amounting in the aggregate to $4,648.08, from January to October, 1947, were entered in the column "other trust deductions," and according to descriptive wording, represented payments of state and Federal personal and fiduciary tax or insurance premiums. On the Edward Paster sheet, there was similarly only one amount, $762.91, described as "refund on 46 Fed tax," entered after January 31, 1946, as an addition to the purported trust fund. Six items, amounting in the aggregate to $2,817.97, ranging in dates from January to September, 1946, and five items, amounting in the aggregate to $4,570.35, under dates from January to October, 1947, were entered in the column "other trust deductions," and as in the case of Donald Paster, were described as payments for state and Federal fiduciary and personal taxes and insurance premiums. On all three *165 sheets the items entered under dates subsequent to January 31, 1946, in the columns headed "other trust deductions," were by symbols shown as having been paid by Mayflower Distributing Company, Paster Distributing Company, Paster Enterprises and H. Paster personally. [4] There were no entries on any of the sheets designed to show any payments or additions to the purported trusts after January 31, 1946, of profits payments or distributions by Mayflower, its successor, or successors. Johnson was a graduate in accounting from the School of Business Administration of *166 the University of Minnesota, and except for a portion of his duties in a prior employment, his work and experience during his business life had been in the accounting field. During the fiscal year ended January 31, 1944, Mayflower in the course of or in connection with its business obtained a loan or loans amounting to $35,000 from a St. Paul bank, and according to its return of income for that year, incurred interest thereon of $1,105.93. Also according to its return, it had interest expense for that year of $2,635.36 to Coin Machine Acceptance Corporation, Chicago, Illinois; $119.59 to Northwestern National Bank, Minneapolis; $296.53 to Central Bank & Trust Company, Des Moines; and $824.72 to Broad Street Trust Company, Philadelphia, Pennsylvania, bringing total interest expense reported to $4,982.13. Also according to its return of income for the fiscal year 1944, it incurred finance fees of $22,171.65 to Utility Finance Company. For the fiscal year ended January 31, 1945, it incurred, according to its return of income, interest of $250 to Central National Bank & Trust Company, Des Moines, and $1,215.87 to Northwestern National Bank, Minneapolis, or a total of $1,465.87. It also *167 reported finance fees to Utility Finance Company of $22,999.22. The Utility Finance Company was owned by or was the individual enterprise of Taran. On its return for its fiscal year ended January 31, 1946, Mayflower reported interest payments of $12,864.45 and finance fees of $6,946.44. The profits of Mayflower credited on its books to the "Note Payable - H. Paster, Sam Walzer Trust" account for each of the fiscal years ended January 31, 1944, 1945 and 1946, were income to petitioner and in so far as the side tabulations of moneys or percentages of profits "due others" for each of those years or the entries made on Mayflower's books or the three sheets maintained by Johnson tend or purport to show otherwise, they are shams and do not reflect the facts. Opinion The question is whether $51,519.81 for 1944, $33,879.66 for 1945 and $39,223.26 for 1946 was the income of petitioner, and not the income of trusts for Celia, Donald and Edward Paster, as shown by the tabulations of moneys or profits "due others" for Mayflower's fiscal years 1944, 1945 and 1946. It is the claim of the petitioner that he made bona fide gifts of $10,000 each to valid and subsisting trusts for his wife and *168 each of two sons; that through oral agreements with Taran, entered into in January of 1943, the corpus of each of the three trusts was left with Mayflower and for the use of such trust funds the trusts were entitled to receive, and did receive, 21 per cent of the profits of Mayflower for each of the fiscal years 1944, 1945 and 1946. It is the position of the respondent that the arrangement or agreement with Taran was nothing more than a scheme to split the earnings of petitioner for income tax purposes, and, in that respect, was a subterfuge and a sham and the amounts in question represented earnings of petitioner, and are taxable to him. To maintain his position, petitioner relies on his own testimony, the testimony of Johnson and certain documentary evidence which for the most part consists of transcriptions from Mayflower's books of account, which were kept by Johnson, and various Federal income and tax returns prepared by him. It does appear that the three trust instruments, plus certain of the bookkeeping entries and accounting records, were designed and purport to show and indicate the ownership by the trusts of the $30,000 purportedly granted to them but retained and used *169 in Mayflower's business and in consideration of which the payment of the indicated percentage of the profits was to be made to the trusts as petitioner claims. The contention is also supported by various assertions and statements in the testimony of both petitioner and Johnson. From other records and other portions of the testimony of petitioner and Johnson, however, we are convinced that determinative facts require a conclusion contrary to that for which petitioner contends. According to petitioner's testimony, the arrangement between him and Taran for the retention and use by Mayflower of $30,000 of the moneys due him for services rendered and which he purportedly had assigned to the trusts was orally agreed upon in January of 1943. The agreement was never reduced to writing and there were no witnesses to the discussion, although petitioner did testify that he talked the matter over with Celia, his wife, and with Sam Walzer, his co-trustee. Taran was not a citizen of the United States, and as pictured by petitioner did not, to say the least, have a wholesome reputation. It was petitioner's testimony also that he personally had had difficulties with Taran on prior occasions and *170 had been discharged several times from his employment with Mayflower, and at the time of the purported agreement was concerned lest he be discharged again. On the basis, however, of an oral promise from Taran that even if petitioner should be discharged the participation of the trusts in Mayflower's profits should continue, he asserts that he proceeded to commit to Taran's use and control $30,000, not of his money but money in respect of which, according to his claim and testimony herein, he and Walzer then stood in a fiduciary capacity. He admitted that Mayflower was engaged in a hazardous business and might be affected adversely by legislation since "pinball" companies were not popular with the Legislature. And to make the story even more bizarre and incongruous, it would appear from the memorandum on the tabulation "Determination of moneys due others 2/1/43 - 1/31/44," upon which petitioner relies, that under the agreement with Taran he and Walzer could not withdraw the said $30,000 from Mayflower without its, namely, Taran's, consent. In contrast with the stated restriction on the withdrawal of the $30,000 of purported trust funds and anent petitioner's testimony of Mayflower's *171 difficulties in procuring the cash required for its operations and of his individual difficulties and differences with Taran, it is to be noted from Mayflower's books of account that petitioner, by January 31, 1944, had been permitted to overdraw his personal drawing account by at least $64,542.92, [5] as against a credit balance of only $21,511.82 in the "Note Payable - H. Paster" account. The overdrawing of his drawing account was apparently the usual thing with petitioner, since $17,443.32 of the total at January 31, 1944, had been from the fiscal year 1943. And though the business of Mayflower was growing, and such being the circumstances *172 it would be only reasonable to conclude that his responsibilities as its manager were becoming correspondingly greater, it is to be noted that under the claimed agreement petitioner was consenting to a reduction in his compensation, namely, a reduction of his bonus from 20 to 14 per cent of Mayflower's profits. It is argued that this reduction was made up or accounted for by an increase in his weekly recompense from $75 to $100 per week, and in addition he was to receive the use of an automobile. The facts show, however, that the bonus had become substantially the major part of petitioner's compensation and there is no showing that a $25 increase in his weekly stipend, together with the use of an automobile, would be in any way comparable to the 6 per cent of Mayflower's profits which he was agreeing to relinquish. In any event, the news of the arrangement does not appear to have been currently transmitted to Johnson, or Johnson was quite lax or greatly behind in his bookkeeping, since the first entry on Mayflower's books, at least so far as the record shows, relating to the weekly salary as increased was not made until September 30, when $3,400 purportedly representing $100 per week *173 from February 1 to the end of September was entered in the ledger account "Salary & Bonus - H Paster H Paster, trusts." This entry apparently was from a journal entry of the same purport and under the same date. Although he was aware of the trust instruments, having signed them as a witness, Johnson's first knowledge, so far as appears, of any details of the purported profit-sharing arrangement by the trusts came at the end of Mayflower's fiscal year ended January 31, 1944, when, according to his testimony, he was instructed by Taran to prepare a statement showing the distribution of Mayflower's profits for the year and was told that each trust was to receive 7 per cent and petitioner 14 per cent of Mayflower's profits. Pursuant to those instructions, he made up the side tabulation"Determination of moneys due others" and on that tabulation, after showing amounts as the net income of the St. Paul, Des Moines and Buffalo branches of Mayflower's operation and allowing for amounts denominated "Salary - S. H. Taran," entered as belonging to the trusts and to Paster the above indicated percentages. From this tabulation he made appropriate journal entries from which he carried the percentages *174 so computed to an account denominated "Note Payable - H. Paster" and to an account then set up, or which had been set up, as "Note Payable - H. Paster, Sam Walzer Trust." In passing it may be observed that no notes were shown as ever having been issued and although Johnson expressed his understanding to be that notes were to be issued, there is no other indication of record that there was ever any intention that notes should be issued. [6]
More revealing and indicative of the true situation, we think, are various other entries and records made by Johnson in the regular course of keeping Mayflower's accounts and preparing its partnership *175 returns. On Mayflower's returns of income for the years ending January 31, 1944, 1945 and 1946, the so-called bonus to the trusts was listed and deducted as "Selling Expenses" along with the amounts shown as petitioner's salary and bonus, whereas finance fees and interest on loans were deducted as "Administrative Expenses." This treatment on the returns of the amounts in question appears to be a follow through of the original entries made by Johnson in Mayflower's journal. The entries for the fiscal year 1944 made immediately following his instructions from Taran did separate the so-called "H. Paster, Trust, Bonus" from the "H. Paster Bonus" but for the fiscal years 1945 and 1946 the journal entries show only one sum with the explanatory wording "H. Paster Bonus" and it was only in making the entries in the ledger accounts "Note Payable - H. Paster" and "Note Payable - H. Paster, Sam Walzer Trust" that the amount so entered in the journal as "H Paster Bonus" was divided as between petitioner individually and the trusts. Regardless of that breakdown in the two so-called "Note Payable" accounts, however, the entire amount in the regular course of keeping Mayflower's books was carried *176 through the "Salary & Bonus - H. Paster, H Paster trusts" account, into profit and loss and as already noted into the partnership returns as "Selling Expenses." It was Johnson's testimony that the purported trust bonus was listed in the partnership returns as "Selling Expenses" because it was "in the sales expense category in the book of accounts." To the question on direct examination "Did you intend to indicate by that that that profit sharing bonus was being paid to anybody for doing any selling," Johnson answered "No." The only explanation offered as to why he considered the share of the profits credited to the trusts as a bonus and entered it on the returns as selling expenses, when purportedly it was compensation for the use of money, was that he "probably * * * didn't think of any better name to call it at that time," and though it was the largest single item listed under "Selling Expenses" his further statement was that "It evidently was made in the wrong part of the books, * * * but for simplicity and for ease of obtaining information on the account, when it was necessary, it was placed together with Mr. Paster's account in the selling expenses account." We fail to see *177 how the grouping of what was a purported share of profits paid for the use of money with petitioner's bonus and salary as a selling expense was a more convenient and simple way of handling the account as Johnson represented, unless it was in truth and in fact compensation due petitioner for services rendered and the side trust account was designed under an arrangement by petitioner with Taran to give the so-called trust bonus the appearance of being other than it was. For while it does appear that Johnson was neither a certified public accountant nor a public accountant, the record shows that he was a graduate in accounting from the School of Business Administration of the University of Minnesota, and except for a portion of his duties in a prior employment his work and experience during his business life had been in the accounting field. And though it was in response to a leading question from petitioner's counsel Johnson agreed that he did "know the principles of accounting and bookkeeping." From a study of the record, including the various returns prepared by Johnson and the portions of books of account kept by him, we are not convinced that Johnson would classify liabilities incurred *178 as selling expenses unless for the purpose of properly reflecting Mayflower's operations he actually regarded them as such. We are also satisfied on the evidence that petitioner's dominion over and use of the balance claimed as the trusts' portion of Mayflower's earnings for the years herein are inconsistent with a status of trustee with respect thereto and with his claims herein. The petitioner admittedly became the owner of the Mayflower business not later than January 31, 1946, [7] at which time, according to the "Note Payable - H. Paster, Sam Walzer Trust" account, the balance owing by Mayflower to the trusts was $110,735.41. No part of this amount was paid by Mayflower and the account was closed by a debit of $110,735.41 indicating assumption of a liability in that amount by petitioner. Actually the closing entry on Mayflower's books indicates that Paster had issued his note covering the liability, but there again there is no indication or claim that he did issue such a note or that it was ever intended that he would. *179 In the course of his testimony petitioner was put through a series of questions patently designed to indicate that "not a cent" of the withdrawals of the "trust shares" of profits of Mayflower were used for living expenses of petitioner's wife or children or for petitioner's own personal use, and that the setting up of the trusts was real and genuine and not a sham transaction, to which questions petitioner was able to give the desired answer merely by saying "No sir." Later in his testimony, however, and after explaining some of the withdrawals which were entered in the Mayflower accounts and on the sheets maintained by Johnson for the trusts it was petitioner's testimony "and I also drew some money for a home." We were left without explanation as to the date of the withdrawal of the "money for a home," the amount thereof, or the identity of the property. But, whatever may be the truth as to the purchasing of a family home and the source of the funds used therefor petitioner admits that after his acquisition of Mayflower the trusts had no participation in the profits of the business, it being his testimony that he assumed and satisfied the said liability "to the trusts" by turning *180 "over two apartment buildings, and by purchasing bonds for them." We are not advised, however, as to the date or dates of the claimed transfers or purchases, and beyond the assertion that the down payment on the two apartments, identified by him as 2171 and 2175 Grand, amounted to $50,000 and the total price to be paid was $150,000, we are left in the dark as to the value of his equity in the properties at the time of the claimed transfer or whether such value was in any way comparable to the amount which it is claimed he owed to himself and Walzer as trustees. We do know, however, that on his income tax return for the calendar year 1946, the properties at 2171 and 2175 Grand, presumably standing in the name of Paster Enterprises, were shown as belonging to petitioner as late as December 31, 1946, that in the said return he reported as his income substantial rentals from the properties and in arriving at his net income deducted an allowance for depreciation on the buildings for the calendar year 1946. Further, there is no claim or contention that any of the rentals for 1946 were ever assigned to the trusts or regarded as belonging to them. We also know that up to October 6, 1947, no *181 entries had been made on the sheets maintained by Johnson for the purported trusts which would in any way reflect the payment by petitioner of the $110,735.41 claimed to have been owed to the trusts, the receipt by the trusts of any payments for the use thereof, or the purchase of any bonds or the transfer of the two apartment buildings in satisfaction of the liability which he says he assumed. In short, even if we should take petitiioner's testimony at its face, it would appear that he or his business was making free use for an indefinite period or at least through October 6, 1947, of the $110,735.41 in respect of which he and Walzer are claimed to have been trustees. Johnson in his testimony attempted corroboration of petitioner's claim that he satisfied the claimed "liability" to the trusts by transfers of real estate. In addition to the apartment houses at 2171 and 2175 Grand, Johnson also included the transfer of a residence [8] at 1752 Pinehurst Street. Much better corroboration, we think, would have been the record proof of such transfers which would have included the dates thereof as well as the description of the properties transferred, particularly when it is noted that *182 Johnson had very little, if any, personal or direct knowledge in the matter. Though he had made no entries either on Mayflower's books of account or the sheets maintained for the trusts to that effect, it was his testimony on cross-examination that the three properties had been purchased by petitioner with moneys which belonged to the trusts. On redirect and in response to leading questions it was his testimony that the properties were purchased with Paster's personal funds. Subsequently, in response to questions by the Court he attributed his only knowledge of the transactions to what he had been told by Frisch, who was described as a St. Paul attorney and as having drawn up the trust instruments for petitioner. *183 As supporting his claim petitioner testified that the trust instruments were drawn by a lawyer named Frisch and gave a version of what Frisch told him as to the force and effect of the things done. And though the testimony so given was particularly self-serving, Frisch was not called in corroboration even though he was purportedly practicing law in St. Paul, the city where the trial herein took place. Similarly, Sam Walzer was not called to testify. Walzer was said to have accepted and assumed the duties and responsibilities of co-trustee with petitioner and according to Johnson lived in Minneapolis, the twin city of St. Paul. The failure of Walzer to testify appears to be of particular significance when note is taken of petitioner's delay, if not failure, in accounting to himself and Walzer for the funds said to have been owing by Mayflower to the trusts at January 31, 1946, when, according to petitioner, he acquired the Mayflower business and personally assumed the liability. Taran likewise was a key figure in the purported transactions and dealings but did not testify. We listened attentively to both petitioner and Johnson in the course of their testimony and we observed them *184 throughout. We have since examined and re-examined the transcript and the other evidence of record, and taking into account the record as a whole, we are satisfied and have found as a fact that in so far as the side tabulations of moneys or percentages of profits "due others" for the fiscal years ended January 31, 1944, 1945 and 1946, the entries made on the Mayflower books and the sheets maintained by Johnson or other records relied on herein tend or purport to show that the amounts in question were the income of the trusts and not the income of petitioner, they were shams and did not reflect the truth. Whether petitioner did or may have created or established valid and subsisting trusts for the benefit of his wife and two sons and the trusts did or may have at some time become the owners in trust of the moneys in question or of property transferred in lieu thereof, we do not find it necessary to decide, since on the record we are satisfied that the moneys in question were the income of petitioner, whatever may have been its disposition thereafter. Petitioner's contention is accordingly rejected. Due, however, to concessions made by each of the parties, a recomputation of the deficiencies *185 is required. Decisions will be entered under Rule 50. Footnotes
1. The identity of Roisner and his relationship to Mayflower or Taran, or his connection with this case, are not clear. In his opening statement, petitioner's counsel had stated that Roisner, "who had theretofore been employed in the business and theretofore had been receiving 15 per cent of the profits, was terminating his relationship with the business," making it possible for Mayflower to apply the 15 per cent previously paid to Roisner to the trusts, and that "the reduction of petitioner's compensation from 20 per cent to 14 per cent supplied the difference between 15 per cent that Roisner had been getting and the 21 per cent that the trusts would receive." In his proposed finding of fact appears the statement that prior to February 1, 1943, Roisner was serving Mayflower in an administrative capacity; that he received a share of the profits of the business, but the evidence does not show what percentage he received. Petitioner and Johnson, the only witnesses called in the trial of this proceeding, either did not know the full story or refrained from giving it. Their testimony ranged from statements that they did not know what Roisner's relationship to the business was or the basis of the payment to him, to Johnson's expressed belief that Roisner "was serving in administrative capacity of some kind" and that he had "the proper connection with factory lines and things that made it worthwhile to have him connected with the firm" and petitioner's statement that he was an employee, to the further statements by petitioner that though he didn't know what "investment" Roisner had in the business, he did know he received quite a portion of the profits, and that Roisner "was a stranger, and he received proportionately, I think, much more than seven per cent." Furthermore, the significance of the entry closing the account is not known, it being the petitioner's statement that he paid Roisner $7,000 with respect thereto on his acquisition of the Mayflower business in 1946. On his 1946 return, he claimed a deduction of $7,000, under the description "Payment to M. Roisner to remain out of competition in coin machine business for the year 1946."↩
2. The entries on the ledger sheets placed in evidence began with 1943 and the first entry was $3,400, under date of September 30, and was described "$100.00 wk for 34 wks 2/1/43 thru 9/30/43." Thereafter entries were regularly made as of the end of each month and in amount appeared to represent $100 per week for the weeks which had elapsed since the date of the last preceding entry. ↩
3. For all three years, and preceding the lump sum entries, there was a descriptive breakdown on the "Salary & Bonus" account as between "Bonus - H. Paster" and "trusts," the amounts of such breakdowns being the same as shown on the above side tabulations.↩
4. From petitioner's individual income tax return for 1946, it would appear that Paster Enterprises was an individual enterprise of petitioner, although it was Johnson's testimony that it represented "some real estate holdings of Mr. Paster and Mrs. Paster." As to Paster Distributing Company, there is some indication of record that it was the name applied to the business of Mayflower after it was acquired by petitioner. On some undisclosed date or dates after petitioner's acquisition, the various branches of the business appear to have been separately incorporated, each taking the name Paster Distributing Co., Inc.↩
5. $64,542.92 is a computed balance as reflected by one ledger sheet of petitioner's drawing account, placed in evidence. The account "Note Payable - H. Paster," however, shows a charge under date of January 31, 1944, of $69,546.92 as a transferred debit "from drawing a/c." Under the same date petitioner's "Note Payable" account was credited with $17,188.56 as having been expended by petitioner for trust beneficiaries. An offsetting charge of $17,188.56 was entered under the same date in the "Note Payable - H. Paster, Sam Walzer Trust" account.↩
6. One of the exhibits placed in the record by petitioner was a copy of the ledger account relating to the mystery man, M. Roisner. That account likewise was set up under the description "Note Payable" but, as in the above instances, there is no indication or showing that any notes were issued or intended to be issued. In fact, such information as does appear of record would cast a grave doubt as to whether the $40,000 was ever paid by Mayflower, even though the account was closed by a credit entry some four months after the original entry was made.↩
7. Mayflower's partnership return for the fiscal year ended January 31, 1946, shows on schedules attached that the Des Moines Branch was sold by Mayflower to the "Paster Distributing Company" on September 19, 1945, and the schedules relating to the Buffalo operation show a cutoff date of August 4, 1945.↩
8. Presumably, 1752 Pinehurst was the Paster family home since that was the address given on the 1944, 1945 and 1946 income tax returns of petitioner, of Celia, his wife, and of his two sons, Edward and Donald, and apparently they were living there at least as early as March 15, 1945, since that was the date on which petitioner's individual income tax return for 1944 was filed. As to whether this was the home for which he "drew some money" from the "trust shares" of Mayflower profits the record is silent.↩